UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JACK PETTIT, personal representative | ) | |
| of the estate of Harold Pettit, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13-CV-253 PPS |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Harold Pettit was a 92-year-old World War II veteran when he fell and sustained

a fractured hip while at the Jesse Brown VA Hospital in Chicago. He brought this

action against the United States under the Federal Tort Claims Act ("FTCA"), asserting

that he received negligent nursing care while at the VA Hospital and that the negligent

care is what caused the injuries that he sustained. Mr. Pettit has since passed away. The

personal representative of Mr. Pettit's estate, his son Jack Pettit, was substituted as

plaintiff. A four-day bench trial was held last fall. Because I find that the nursing care

that Mr. Pettit received from the VA met the appropriate standard of care, and for the

other reasons discussed below, judgment is in favor of the United States and against

Mr. Pettit.

The following are the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52(a). To the extent certain findings of fact may be

deemed to be conclusions of law, they shall also be considered the Court's conclusions

of law.  By the same token, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered the Court's factual findings.

## Findings of Fact

### Relevant Background Facts

Harold Pettit was born in 1921.  He enlisted in the Army Air Corps during 1941, and is a World War II veteran.  During his service, he was assigned to assemble airplanes.  As a veteran, he is eligible for veteran's benefits, and he routinely received his medical care from the Adam Benjamin, Jr. Veterans Affairs Clinic in Crown Point, Indiana. The Crown Point VA Clinic is a primary care medical facility that is not equipped to handle patients who need acute in-patient care at a hospital. Instead, if Crown Point VA patients are in need of acute care, they are sent to the Jesse Brown VA Hospital in Chicago.

During the morning of June 7, 2012, Mr. Pettit was experiencing symptoms of his second stroke. He called his daughter-in-law, Pam Pettit, and asked her to drive him to the Crown Point VA Clinic.  She picked him up at his house, and when she arrived, he was standing on the front porch.  Mr. Pettit walked down the steps of his house with Pam's assistance and walked about twenty feet and got into Pam's car.   According to Pam, he seemed fine.  They proceeded to the Crown Point VA Clinic.  They talked along the way and he told his daughter-in-law that he was "feeling funny." When they arrived, Pam dropped him off at the door, and told him to wait while she went to park

the car.  Mr. Pettit walked into the clinic without assistance, and he was eventually put into an exam room.

Hayssam Kadah, M.D., is a board certified internal medicine and geriatric physician at the Crown Point VA Clinic. He had been Mr. Pettit's primary care physician at least since 2002.  Dr. Kaddah was on duty at the clinic that day, and he attended to Mr. Pettit. According to Dr. Kaddah's report, Mr. Pettit rose and took a few short steps to the examining table.  (Def. Ex.  D at 1258.)[1] Dr. Kadah immediately identified Mt. Pettit's symptoms as a probable stroke. This was because Mr. Pettit had some compromise in his visual field which is indicative of a potential failure of his vascular system, all of which points to a stroke. Dr. Kaddah therefore ordered Mr. Pettit's immediate transfer by ambulance to Jesse Brown VA Medical Center.

Jesse Brown is a full-service acute care hospital for veterans located in Chicago. Mr. Pettit arrived at the emergency department of Jesse Brown by ambulance at 10:18 a.m. on June 7, 2012.  His admitting diagnosis at Jesse Brown was a stroke which was an acute event that likely occurred within the twenty-four hours before Mr. Pettit saw Dr. Kadah at the VA Clinic in Crown Point. (Transcript of Bench Trial at  178, 333, hereinafter "Tr. at__".)

We will return to the story of what happened at Jesse Brown in a moment, but let's step back for some more background on Mr. Pettit. Mr. Pettit had his first stroke in the early '90s.  (Tr. at 334.)  But other than that, at the time of his admission to the Jesse

---

[1]Page references to defendant's Exhibit D are the "pettitva" numbers in that Exhibit.

Brown VA Hospital, all in all, Mr. Pettit was relatively active and healthy for a 92-year-old man. According to his daughter-in-law, Pam Pettit, prior to June 2012, she could not recall any major concern with Mr. Pettit's short term memory. There were no episodes of forgetfulness or short term memory loss that she could observe and she spoke with him almost daily. Mr. Pettit's son, Jack, said pretty much the same thing. There were occasions when they arranged a dinner with Mr. Pettit and he would have to call to be reminded of the appointed time, but other than these minor memory lapses, Mr. Pettit was still pretty sharp.

Mr. Pettit still occasionally played golf and when he wasn't playing, he served as a scorekeeper for his senior golf league. He mowed his own lawn with the use of a riding mower. He also continued to drive on occasion as well as do his own grocery shopping and budgeting. (Pl. Ex. 1263.)[2]

It is also the case that Mr. Pettit wasn't always compliant with his medical care. For example, about a month before his latest stroke, Mr. Pettit went to see Dr. Kaddah. This was on May 1, 2012. At that time, he was complaining of low back pain. He had a cane but he rarely used it and this was noted by the doctor. Although he was holding the cane, he really wasn't relying on it. The plan was for him to use his cane because he had an arthritic condition and an abnormal gait and thus he was prone to falling. He also had uncontrolled hypertension; the problem was that he was not taking his blood pressure medications as directed by Dr. Kaddah. Mr. Pettit was also diagnosed with

---

[2]Unless otherwise noted, plaintiff's exhibit numbers are "pettitva" numbers.

depression and was prescribed antidepressant medication from 2004 through 2012. (Tr. at 325.)

**Medical Care Provided to Harold Pettit at Jesse Brown**

After spending a significant amount of time in the emergency room, Mr. Pettit was formally admitted at Jesse Brown between approximately 10:15 p.m. and 10:30 p.m. on June 7, 2012.  The admitting registered nurse was Latha Jayakumar.  Nurse Jayakumar has sixteen years of experience as a registered nurse doing direct patient care in a hospital setting.  Her shift ended at midnight on June 7, 2012,  so Nurse Jayakumar had limited dealings with Mr. Pettit on that day.  What she did do, after receiving an oral report from the registered nurse in the emergency department, was assess Mr. Pettit for forty-five to sixty minutes by interviewing him at his bedside.

On the basis of her interview with Mr. Pettit, Nurse Jayakumar assessed him as a high fall risk using the Morse Fall Assessment Tool.  (Def. Ex. C at 833.)  The Morse Fall Assessment Tool uses the following questions to evaluate how great a fall risk a patient is: (1) Does the patient have a history of falls?  (2) Is the patient on any kind of medication?  (3) Does the  patient use an ambulatory aid such as a cane or a walker?  (4) Is the patient hooked to an IV?  (5) Does the patient have a weak gait?  And, (6) what is the patient's mental capacity?  Each of these inquiries is assigned a score from one to fifteen.  So the highest possible score—meaning the highest risk of fall—is ninety (15 x 6). Anything over forty-five is considered to be a high fall risk.  Use of the Morse Fall assessment is the standard of care in a hospital setting and is customarily taught in

nursing programs. As can be seen by the various factors that go into the Morse Fall Assessment, this is a highly subjective evaluation that necessarily involves an element of nursing judgment. (Tr. at 140, 213, 382-84.)

After a thorough assessment, Nurse Jayakumar designated Mr. Pettit as a high fall risk. She therefore implemented the standard high fall risk precautions which included the following patient instructions: (1) Mr. Pettit was told that he had to use the call light and wait for assistance before getting out of bed and walking; (2) he was instructed to sit up in bed and wait a minute or more before standing or transferring; (3) he was admonished to always use sturdy rubber soled shoes or hard sole slippers when out of bed; (4) he was to immediately report any spills on the floor; (5) he was told to not lean on a bedside table for support or lean over the table; and (6) he was instructed to not bend over or lean over to pick up or reach for things without assistance. Nurse Jayakumar specifically discussed all these topics with Mr. Pettit, and he told her that he understood. (*See* Def. Ex. C at 832–33, Tr. at 213–14.)

Other than the patient education and instruction discussed above, Nurse Jayakumar also implemented the following high risk fall precautions for Mr. Pettit's environment of care: (1) she ensured that the call light was within easy reach and answered promptly; (2) she placed the bed in a low position and locked the bed wheels; (3) she provided night lights; (4) she made sure that the floor was free of clutter; (5) she made sure that spills were cleaned up immediately; (6) she placed Mr. Pettit's personal articles within easy reach; and (7) she modified the environment for safe transfers.

Nurse Jayakumar also placed gripper socks on Mr. Pettit. (Def. Ex. D at 1233, Tr. at 214–15.)

Nurse Jayakumar also questioned Mr. Pettit at length in an effort to assess his mental capacity. She determined that he was alert and oriented to name, time, and place. And on the basis of her assessment, she determined that he was not confused and that he understood his limitations. She therefore felt comfortable in instructing him that for his own safety he needed to call the nurse and wait for assistance before getting out of bed. Nurse Jayakumar also implemented hourly surveillance rounds for Mr. Pettit. Once the need for hourly surveillance rounds is charted, nurses and nursing assistants record completion of the rounds on a white board in the patient's room. (Tr. at 215–16, Def. Ex. D at 1233.)

On the basis of her thorough assessment of Mr. Pettit, and given the fact that he seemed well oriented and not confused, Nurse Jayakumar used her nursing judgment not to turn on a bed alarm for Mr. Pettit. (Tr. at 218–19.) Bed alarms are devices that, when activated, send out an audible noise when a patient attempts to get out of bed and thus notifies the attending nurse to that fact. (Tr. at 106.) Bed alarms are ordinarily used when a patient is not oriented to time and place, and when it seems likely that the patient is unable to follow the instruction to stay in bed and only get out of bed with the assistance of a nurse. Whether the bed alarm should have been activated for Mr. Pettit was contested at trial and was the subject of dueling expert testimony. We will return to the issue of bed alarms in a moment.

After Nurse Jayakumar finished interviewing and assessing Mr. Pettit and writing her nursing notes of her assessment during the late evening of June 7, 2012, her shift was over, and there was not time to review any of Mr. Pettit's medical records. She spent the last half hour of her shift orally reporting on each of her patients, including Mr. Pettit, to the incoming shift nurses. She then clocked out for the night and turned over the care of Mr. Pettit to Nurse Mojisola Manieson.

Nurse Manieson has more than twenty years experience as a registered nurse doing direct patient care in a hospital setting. Her nursing shift caring for Mr. Pettit started on June 7 at 11:30 pm and finished on June 8 at 8:00 am. Nurse Manieson testified credibly that she had no independent recollection of the day in question and that her testimony was based upon the nursing notes that she had reviewed. At the beginning of her shift, she received the oral report from the nurse who preceded her that day, Nurse Jayakumar. The oral report regarding Mr. Pettit included his name, age, diagnosis, medications, and the fact that he was a high fall risk. (Tr. at 231-32.)

At the beginning of her shift, Nurse Manieson read the history and physical of the Jesse Brown physician who admitted Mr. Pettit. She also read the prior shift nursing notes of Nurse Jayakumar regarding her assessment and care of Mr. Pettit. (Tr. at 232.) On the basis of her interview of Mr. Pettit and her review of the prior shift nursing notes, Nurse Manieson assessed him as a high fall risk using the Morse Fall Assessment Tool. (Tr. at 233-37.) As such, she continued the high fall risk precautions put into place by Nurse Jayakumar. (Tr. at 234-35.) This was based in part on her own interview of Mr.

Pettit where she assessed him and determined that he understood his own limitations. She also concluded that he understood that for his own safety he needed to call the nurse and wait for assistance before getting out of bed. She determined that Mr. Pettit was alert and oriented to name, time, and place. (Tr. at 235–37.)

On the basis of her assessment of Mr. Pettit, Nurse Manieson made a judgment to not activate the bed alarm. She testified that a bed alarm is only to be used when a patient is confused or disoriented, and a high fall risk. If, for example, a patient didn't know his own name or didn't know where he was, those might be occasions when a bed alarm might be activated. But in the case of Mr. Pettit, Nurse Manieson satisfied herself that he was alert and oriented and understood her instructions, and as a result she made a judgment to not turn on the bed alarm. (*See* Def. Ex. D at 1180.) But because he was a high fall risk, Nurse Manieson instructed Mr. Pettit that if he needed any assistance that he should use the call button and that he should not get up by himself without assistance. (Tr. at 236.) She then put up the guard rails on his bedside and made sure the call light was within reach, as a well as putting a yellow armband on his arm to signify the fact that he was a fall risk. (Def. Ex. D at 1178–79.)

Nurse Manieson's shift ended at 8:00 a.m on June 8 without incident. She was relieved that day by Registered Nurse Cynthia Mendoza. Nurse Mendoza is a 36-year veteran, having worked her entire career as a registered nurse doing direct patient care in a  hospital setting. Her nursing shift caring for Mr. Pettit started at 7:30 a.m. and ended at 4:00 p.m. As with the other shifts, her day began by receiving an oral report

from her predecessor, Nurse Manieson. The oral report included basic information such as Mr. Pettit's name, age, diagnosis, and the fact that he was a high fall risk. (Tr. at 254 - 55.) Nurse Mendoza, as is her normal practice, then read the history and physical of the physician who admitted Mr. Pettit. She also read the prior shift nursing notes of Nurse Manieson regarding her nursing care of Mr. Pettit. (Tr. at 255-56.)

In contrast to the other nurses, Nurse Mendoza assessed Mr. Pettit to be a medium fall risk under the Morse Scale. This was based on her interview of Mr. Pettit and her review of the prior shift nursing notes. (Tr. at 256; Def. Ex. D at 1157.) Nurse Mendoza found Mr. Pettit to be a very pleasant man who appeared completely oriented to his own abilities. (Tr. at 247, Def. Ex. D at 1157.) She tested his short-term memory by asking him a series of questions and then repeating those questions a few minutes later to see if he was answering in the same manner, and he was. (Tr. at 249.) Nurse Mendoza saw no signs of any cognitive impairments with Mr. Pettit. Nurse Mendoza then gave Mr. Pettit instructions for him to call her if he wanted to get out of bed. (Def. Ex. D at 1157.)

Even though Nurse Mendoza deemed Mr. Pettit to be a medium fall risk, she nonetheless instituted high fall risk procedures. (Tr. at 257, Def. Ex. D at 1155.) She made sure the safety rails were up on his bed and that the call light was easily within his reach. She also made sure that he had a yellow armband to denote the fact that he was a fall risk. Nurse Mendoza was satisfied that Mr. Pettit understood her instructions because during the course of her shift, he in fact used the call button to get assistance in

getting out of bed to use the bathroom. (Tr. at 257-59.) Indeed, during the entirety of her shift, Mr. Pettit never got out of bed without first pressing the call light and waiting for assistance. (Tr. at 260.) It was for this reason, as well as the fact that he appeared completely oriented, that Nurse Mendoza chose not to activate the bed alarm for Mr. Pettit. (*See* Def. Ex. D at 1157.)

Registered Nurse Ligaya Rivera took over the direct care of Mr. Pettit from Nurse Mendoza. Nurse Rivera has twenty-seven years of experience as a registered nurse doing direct patient care in a hospital setting. (Tr. at 267.) Her nursing shift caring for Mr. Pettit began on June 8, 2012, starting at 3:30 p.m and ending at midnight. It was during Nurse Rivera's shift that Mr. Pettit took his fall that precipitated this lawsuit. (Def. Ex. D at 1145.)

At the beginning of her shift, Nurse Rivera received Nurse Mendoza's oral report regarding her nursing care of Mr. Pettit during the prior shift. The oral report included his name, age, diagnosis, medications, and the fact that he was a high fall risk. (Tr. at 280--81.) At the beginning of her shift on June 8, 2012, Nurse Rivera read the history and physical of the Jesse Brown physician who admitted Mr. Pettit as an in-patient. She also read the prior shift nursing notes of Nurse Mendoza. (Tr. at 280-81.) On June 8, 2012, on the basis of Nurse Rivera's interview of Mr. Pettit and review of the prior shift nursing notes of Nurse Mendoza, she assessed him as a high fall risk using the Morse Fall Assessment Tool. (Tr. at 282-85; Def. Ex. D at 1143, 1145, 1157.) Nurse Rivera also continued the high fall risk precautions put into place by the nurse on duty when Mr.

Pettit was first admitted, Nurse Jayakumar.  (Tr. at 283-84; Def. Ex. D at 1143.)

Nurse Rivera interviewed and assessed Mr. Pettit and determined that he understood his own limitations, and that for his own safety he needed to call the nurse and wait for assistance before getting out of bed.  Nurse Rivera noted that Mr. Pettit was alert to time and place and person, meaning that he was not confused or disoriented. (Def. Ex. D at 1143.)  Based on this assessment, she determined that Mr. Pettit understood his  limitations.  (Tr. at 284-85, 287; Def. Ex. D at 1143, Pl. Ex. 1145.) Nurse Rivera nevertheless instituted many of the same precautions that the other nurses had used.  For example, she ensured that the side rails were up on his bed; she saw to it that the call button was within his reach; she saw to it that a yellow arm band was put on him to signify that he was a high fall risk; and she made sure to do hourly visits with him and reminded him on each occasion that he needed to press the call light and ask for assistance before getting out of bed.  (Tr. at 273, 287-88.) With all these procedures in place, Nurse Rivera—in concert with the decision of the previous nurses—used her professional judgment in not activating the bed alarm. The fact that Nurse Rivera re-instructed Mr. Pettit during each of her hourly surveillance rounds that he needed to press the call light and wait for assistance before getting out of bed is one factor that Nurse Rivera appropriately could consider when deciding not to turn on a bed alarm.  (Tr. at 273-74, 408.)

Another factor that went into the decision by Nurse Rivera to not turn on the bed alarm was the fact that on one occasion during the shift immediately before her shift,

Mr. Pettit pressed the call button and waited for assistance before getting out of bed, and that Nurse Mendoza assisted him to the bathroom.  (Tr. at 282-83, 287; Def. Ex. D at 1157.)

On one occasion during Nurse Rivera's shift on June  8, while she was  doing rounds, she discovered Mr. Pettit out of bed and walking without assistance.   In hospital parlance, this is called being "up ad lib." (Tr. at 269-70; Def. Ex. D at 1145.) Nurse Rivera noted that Mr. Pettit was still oriented to his own ability, that he understood that he should not get out of bed without any assistance, and that he knew that the call light had to be used. (Tr. at 284.)  So when Nurse Rivera saw Mr. Pettit out of bed she immediately assisted him back to his bed, again instructed him to use the call light and wait for assistance before getting out of bed, and Mr. Pettit told her that he understood. (Tr. at 285-287, 440-42.) Although Nurse Rivera testified that Mr. Pettit was "forgetful at times" (Tr. at  272),  her overall perspective of him was that he did not appear confused and he was oriented to time, place, and person. (Tr.  at 285, Def. Ex. D at 1143.)

Plaintiff contends that after Mr. Pettit was "up ad lib" Nurse Rivera should have immediately activated the bed alarm. But from Nurse Rivera's point of view, nothing much had changed. Mr. Pettit was still oriented to his own ability. He understood that for his safety he shouldn't get out of bed without assistance. He remained oriented to person, time, and place and he exhibited no signs of being confused. He followed the instructions of Nurse Mendoza in the shift immediately preceding her shift and used

the call light and waited for assistance, and Nurse Mendoza assisted him to the bathroom using a cane. And Nurse Rivera reminded him each time during her hourly surveillance rounds to use the call light and wait for assistance before getting out of bed. On the one occasion that she saw Mr. Pettit out of bed without assistance, she assisted him back to his bed and re-instructed him that for his own safety he must use the call light and wait for assistance before getting out of bed and he verbalized understanding of her instructions. (Tr. at 269, 281-88; Def. Ex. D at 1143, 1145, 1157.)  So for all these reasons, Nurse Rivera, using her professional judgment, made the decision to not turn on the bed alarm. (Tr. at 287.)

At 10:53 pm, Nurse Rivera came into Mr. Pettit's room.  She found him lying on his back on the floor. He was calling for help. When Nurse Rivera arrived on the scene, Mr. Pettit told her that he had tried to get out of bed to go to the bathroom but lost his balance and fell on his right buttock. (Def. Ex. D at 1145.) Nurse Rivera picked Mr. Pettit up and helped him back into bed.  At this point, Nurse Rivera activated the bed alarm and instituted close observation by making sure that a sitter was present in his room. (Tr. at 273-74.) But she again instructed Mr. Pettit about the importance of calling for her first before trying to get out of bed without someone to help him. Surprisingly, this was the first time in Nurse Rivera's twenty-seven year career as a nurse working in a hospital environment that she ever saw a patient lying on the floor as the result of a fall. (Tr. at 275.)

Mr. Pettit suffered a hip fracture as a result of the fall.  (Def. Ex. D at 1124.)  This

caused significant pain which was treated with one to two vicodin. (Def. Ex. D at 1121.) Mr. Pettit was moved closer to the nursing station after the fall and the bed alarms remained activated. (Def. Ex. D at 1122.) Mr. Pettit was eventually moved to a rehab floor at Jesse Brown where he stayed from June 15 through June 28.  Mr. Pettit was released completely from Jesse Brown on July 3, 2012.  (Tr. at 316.)  At that point he was taken to a long term care facility back in Indiana.  By August 18, 2012, Mr. Pettit had completely healed from the fractured hip that he sustained at Jesse Brown. (Tr.  at 318-20.)

**Testimony from Mr. Pettit's Treating Physician**

While at Jesse Brown, Mr. Pettit was under the care of Dr. Patrick Barrett, a board certified physical medicine and rehabilitation physician. Dr. Barrett received his medical degree from the University of Chicago. (Tr.  at 314-15.) As a full-time employee of the VA, Dr. Barrett testified without extra compensation.  (Tr. at 315. )

According to Dr. Barrett, Mr. Pettit's admitting diagnosis at Jesse Brown was a stroke.  The stroke affected the right side of Mr. Pettit's brain. (Tr. at 327). The particular kind of stroke that Mr. Pettit experienced causes a loss of vision of the left visual field in both eyes.  (Tr. at 317-32.) In other words, Mr. Pettit could not see objects or people on his left side. (Tr. at 327.) When patients suffer from this type of stroke, it is highly unlikely that they will ever recover their lost vision. (Tr. at 328.)  Although the stroke caused Mr. Pettit to lose some vision, it did not effect the part of the brain that controls movement. (Tr. at 316-17.) It was for this reason that Mr. Pettit was able to get out of

bed on the morning he suffered the stroke, call his daughter-in-law, walk to her car and into the Crown Point VA Clinic and move about the clinic to some degree. (Tr. at 317.) He may have needed verbal cues to assist him but from the standpoint of physical assistance, he could function independently. (Tr. at 317.)

**Expert Testimony on the Effectiveness of Bed Alarms**

The defense expert, Karen Krooswyk, is a licensed RN in the State of Illinois and has been for thirty-nine years. All of her professional life—some thirty-nine years in all—she has been involved in the business of providing direct patient care in a hospital setting. She has a Masters in Nursing Science and is also a board certified nurse practitioner. She has also been a professor of nursing for more than thirty years. (Tr. at 374–76.) Mr. Pettit's nursing expert, Dr. Carol White, while well credentialed, has much less experience in a hospital environment. (Tr. at 85–6.) Dr. White last worked as a registered nurse doing direct patient care in a hospital setting twenty-two years ago. (Tr. at 126.) On the basis of her experience, her long history of providing direct patient care in a hospital environment, and her overall demeanor as a witness, I found Ms. Krooswyk more credible than Dr. White.

There is a difference of opinion in the professional nursing community and academic nursing community about the efficacy and usefulness of bed alarms. (Tr. at 147, 397.) Dr. White believes that the nursing staff at Jesse Brown should have activated a bed alarm when caring for Mr. Pettit. When activated, a bed alarm will emit a progressively louder sound when a patient attempts to get out of bed. The purpose of a

bed alarm is to alert the nursing staff when a patient is attempting to get out of bed without assistance. But the decision whether or not to activate a bed alarm is committed to the judgment of the individual nurse on staff. (Tr. 405.) Even Dr. White agreed that there are at least some circumstances in which it would be appropriate nursing judgment not to turn on a bed alarm when a patient is a high fall risk. (Tr. at 135.) Nonetheless, Dr. White testified that the nursing staff who cared for Mr. Pettit made an error in judgment when they chose to not activate the bed alarm. By contrast, Ms. Krooswyk opined that the nurses at Jesse Brown used appropriate nursing judgment in not turning on the bed alarm for Mr. Pettit before he fell. (Tr. at 405.)

On the basis of her review of the depositions of the registered nurses at Jesse Brown who cared for Mr. Pettit on June 7 and 8, 2012, without relying on any academic study or physical site visit of the hospital, plaintiff's nursing expert, Dr. White, reached the off-hand conclusion that "it's more likely than not that somebody could've got there in time to prevent the fall" of Mr. Pettit on June 8, if the bed alarm had been activated. She based this conclusion on her recollection from reading depositions that Mr. Pettit's bed was two or three rooms from the nurse's station and that his was the first, not the second bed. I do not find Carol White's off-hand opinion on this point to be credible or persuasive. (Tr. at 150-52.) There is inadequate foundation for the opinion. For example, there was no testimony as to where Mr. Pettit was in the room when he was found following the fall. I find no convincing evidence that activating the alarm would have made any difference in preventing Mr. Pettit's fall.

Mr. Pettit did introduce evidence, over the government's objection, that the bed alarm was turned on after the fall, which he suggests disproves the government's claim that bed alarms are ineffective, but such evidence does not convince me that using a bed alarm would have prevented the fall in Mr. Pettit's case. In other words, the evidence fails to establish that the decision to not activate the bed alarm caused the harm in this case.

Indeed, the evidence that was admitted at trial is actually to the contrary. The only independent research study done by a medical scientist with no economic interest in bed alarms regarding the efficacy of bed alarms is an 18-month study entitled "Effects of an Intervention to Increase Bed Alarm Use to Prevent Falls in Hospitalized Patients," published by the American College of Physicians during November 2012 (Independent Bed Alarm Study). (Tr. at 397-99; Def. Ex. K.) The hospital where the Independent Bed Alarm Study was conducted used some elements of the Morse Fall Assessment Tool when evaluating patients' fall risk. (Tr. at 400.) The Independent Bed Alarm Study had a control group and an intervention group. In the control group, nurses used their nursing judgment regarding whether to turn on a bed alarm for each patient but were not actively encouraged to do so. In the intervention group, nurses were actively encouraged, but not required, to use bed alarms. In the intervention group, bed alarm use was over thirty-two times higher than alarm use in the control group. Nevertheless, the study concluded that "[a]n intervention designed to increase bed alarm use in an urban hospital increased alarm use but had no statistically or

clinically significant effect on fall-related events." (Tr. at 399-401; Def. Ex. K.) Even when bed alarm use was actively encouraged for the intervention group in the Independent Bed Alarm Study, the nurses chose to activate bed alarms for patients only approximately 6% of the time. Accordingly, it seems clear that for the vast majority of patients, nurses exercise their nursing judgment not to turn on a bed alarm. (Tr. at 400; Def. Ex. K.)

The reason for this is that bed alarms don't appear to be particularly effective in preventing a patient from getting up or summoning healthcare workers quickly enough to prevent a fall. For example, after his release from Jesse Brown and following his stay in a rehabilitation facility, Mr. Pettit was placed in the St. Anthony Home. On two occasions—one on December 10, 2013 and the other on March 4, 2014—alarms were activated and sounded when Mr. Pettit attempted to get up without assistance. On both occasions nurses came to his assistance after the alarm sounded. On one occasion, the nurse specifically noted that she immediately came to the room after the alarm sounded. On both occasions, Mr. Pettit fell and injured himself, and the nurses were not able to get to his room in time to attempt to prevent the fall. Thus, on both occasions Mr. Pettit's activated alarms were not effective in preventing him from getting up and then falling and hurting himself. (Tr. at 401-05; Def. Ex. H at 226, 246.)

On the basis of the Independent Bed Alarm Study, the testimony of nursing expert Karen Krooswyk, and Mr. Pettit's own experience with alarms, I find that activating the bed alarm for Mr. Pettit was not likely to have made a difference in

preventing his fall.

As noted, two nursing experts testified during the trial, and the case largely rises and falls on which of the experts the court chooses to credit. The government nursing expert, Karen Krooswyk, is a board certified adult nurse practitioner and has been a registered nurse in Illinois since 1977 with thirty-nine years of experience providing direct care to patients as a registered nurse in a hospital setting. She also has over thirty years experience teaching nursing students in nursing college.

Ms. Krooswyk testified that the standard of care for nursing is that degree of knowledge, skill, and care that a reasonably well-qualified nurse in the same or similar community would bring to a similar case under similar circumstances. (Tr. at 390–91.) Reading the prior shift nurse's notes, and the history and physical of the hospital physician who admitted Mr. Pettit as an in-patient meets the standard of care for medical document review near the beginning of a shift for registered nurses caring for patients in Illinois hospitals. The standard of care does not require nurses in Illinois hospitals also to review emergency room doctor's notes, or clinic physician's notes made before the patient came to the hospital. (Tr. at 391-93.)

Both nursing experts testified that the Morse Fall Assessment Tool is widely used throughout the country and is a good and appropriate tool to assess a patient's fall risk. (Tr. at 140, 213, 382–84.) Both experts agree that the Morse Fall Assessment Tool has an element of nursing judgment. The Morse Fall Assessment Tool is both objective and subjective and can change from shift to shift or even within a shift. (Tr. at 384–85,

394–95.) Patients sometimes fall no matter how careful, and no matter how many fall risk precautions a hospital has in place. (Tr. at 409.)  Although Mr. Pettit had some mild cognitive impairment, he still was capable of understanding and following simple commands. (Tr. at 419–20.)

Some fall risk precautions are routinely instituted for all patients regardless of fall risk.  Hospitals in Illinois do not routinely do hourly surveillance rounds for all of its patients. (Tr. at 409.) Hospitals in Illinois do not put a sitter at the bedside unless the patient is confused,  disoriented, and constantly and repeatedly engaging in behaviors that risk injury. (Tr. at 434.) Hospitals in Illinois do not routinely test a patient's memory of fall precautions five to fifteen minutes after first discussing the fall precautions with the patient, and the standard of care for Illinois hospitals does not require testing of a patient's memory at those intervals. (Tr. at 442.)

According to Ms. Krooswyk, Nurse Rivera's hourly surveillance rounds during which she reminded Mr. Pettit each time that he needed to use a call light and wait for assistance before getting out of bed met the standard of care for registered nurses working in hospitals in Illinois.  Jesse Brown's Fall Prevention Program commits the decision regarding whether to turn on a bed alarm for a patient to nursing judgment. Even a patient who is a high fall risk does not need the bed alarm if the patient is not confused or disoriented. (Tr. at 408.)

## Conclusions of Law

The FTCA provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances. . .." 28 U.S.C. § 2674. A case brought under the FTCA is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Accordingly, this nursing malpractice case is governed by the law of the state of Illinois. A plaintiff in an Illinois medical negligence case must prove (1) the proper standard of care against which the defendant healthcare professional's conduct is measured; (2) a deviation from that standard; and (3) an injury proximately caused by that deviation. *Willaby v. Bendersky*, 891 N.E. 2d 509, 519 (Ill. App. Ct. 2008). In such a case, expert testimony is generally required to establish the standard of care and that its breach was the proximate cause of the plaintiff's injury. *Id.*

### Rule 407 Objection

On the basis of Federal Rule of Evidence 407, the government objected to the admission of evidence of the additional fall prevention measures taken after Mr. Pettit's fall, such as activating the bed alarm and assigning a bedside sitter, asserting that it is not admissible as evidence that the standard of care required bed alarm use or a bedside sitter before Mr. Pettit's fall.

Federal Rule of Evidence 407 provides:

> When measures are taken that would have made an earlier injury
> or harm less likely to occur, evidence of the subsequent measures is not
> admissible to prove:
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as
> impeachment or—if disputed—proving ownership, control, or the
> feasibility of precautionary measures.

I agree with defendant that the evidence cannot be considered in deciding what the
standard of care required before Mr. Pettit's fall, but it does not appear that plaintiff
disputes that such evidence is not admissible for that purpose. Rather, plaintiff argues
that turning on the bed alarm after the fall tends to disprove defendant's contention that
using it before the fall was not likely to have prevented the fall. (Tr. at 149.) I consider it
only for that purpose.

### Plaintiff Failed to Meet his Burden of Proving that the Nurses at the VA Breached the Standard of Care

Plaintiff insists that the nurses at Jesse Brown, and particularly Nurse Rivera, did
not take sufficient fall risk precautions in light of their assessment that Mr. Pettit was a
high risk for falls. According to plaintiff's expert, Dr. White, the standard of care
required Nurse Rivera to activate the bed alarm after she found him "up ad lib" on the
evening of June 8 before his fall. However, in the opinion of defendant's nursing
expert, Ms. Krooswyk, Nurse Rivera exercised reasonable nursing judgment in deciding
not to turn the bed alarm on since, in Nurse Rivera's assessment, he understood his

limitations and that he was not to get out of bed unassisted; he was oriented to person, time, and place and was not confused; during the previous shift he had used the call light and waited for assistance to the bathroom; Nurse Rivera reminded him each time during her hourly surveillance rounds that he was to use the call light and wait for assistance before getting out of bed; and on the one occasion when he did get up without assistance, she helped him back to bed and re-instructed him that he must use the call light and wait for assistance to get out of bed, after which he told her he understood her instructions.

Neither of the nursing experts testified that there is a hard and fast rule as to when a bed alarm must be employed for a patient who is a high fall risk, as Mr. Pettit was; it is rather a matter of nursing judgment. I conclude that the nurses at Jesse Brown, including Nurse Rivera, used reasonable nursing judgment in not employing a bed alarm before Mr. Pettit's fall. Accordingly, plaintiff has failed to carry his burden of proving that they breached the applicable standard of care with respect to bed alarm use.

Plaintiff also maintains that the Defendant breached the standard of care by not putting a bedside sitter in place after Mr. Pettit was found up in his room without assistance on the evening of June 8, 2012. Failure to employ a bedside sitter was not required by the standard of care in Illinois for nurses attending a patient who, like Mr. Pettit, was not confused, disoriented, and constantly and repeatedly engaging in behaviors that risk injury. Nor did the nurses' failure to test Mr. Pettit's memory of fall

precautions five to fifteen minutes after instructing him constitute a deviation from the standard of care in Illinois.

### Plaintiff Did Not Carry his Burden of Proving that any Alleged Deviation from the Standard of Care Caused Harold Pettit's Injury

Under Illinois law, a plaintiff in a medical negligence case must prove causation by a preponderance of the evidence. *Holton v. Memorial Hosp.*, 679 N.E.2d 1202, 1207 (Ill. 1997). Additionally,"[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 855 N.E.2d 261, 270 (Ill. App. Ct. 2006).

Even if I were to have found that failing to turn on the bed alarm before Mr. Pettit's fall was a deviation from the standard of care, I find that the credible evidence does not support the conclusion that doing so would have more probably than not prevented him from falling and breaking his hip. Defendant's Exhibit K, the Independent Bed Alarm Study, teaches that increased alarm usage does not have a statistically or clinically significant effect on fall prevention.  Moreover, Mr. Pettit's own experiences with alarm use at St. Anthony Home tend to negate the efficacy of such devices in preventing falls.  On the other hand, Dr. White's off-the-cuff opinion that a bed alarm would likely have prevented the fall, asserted without an adequate foundation, is little more than a guess.  Nor does the fact that the bed alarm was turned on after the fall persuade me that it would more likely than not have been effective in

preventing the fall. Thus plaintiff has failed to meet his burden on causation with regard to the failure to activate the bed alarm before Mr. Pettit's fall.

## Conclusion

For the reasons explained above the Court grants judgment for the defendant on plaintiff's complaint.

**ENTER:** March 14, 2017.

 S/ Philip P. Simon_____
PHILIP P. SIMON
UNITED STATES DISTRICT COURT